IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

STEVEN COHN,

          Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,

          Defendant.

Case No. 3:19-CV-00376-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment. (Doc. 56).

### FACTS

Plaintiff Steven Cohn, an inmate incarcerated at Lawrence Correctional Center ("Lawrence"), filed this action pursuant to 42 U.S.C. § 1983 on April 4, 2019. (Doc. 1). Cohn brings a *Monell* liability claim against Wexford. (Doc. 8, pp. 3-4).

Since 2016, Cohn has been prescribed lithium. (Doc. 63, pp. 1-2). Then on June 20, 2018, he was transferred to Lawrence. (Doc. 57, p. 2). That same day, a Mental Health Professional ("MHP") at Lawrence evaluated Cohn's mental health. The MHP concluded that he should "return to General Population housing." (Doc. 56-2, p. 3). At the same time, the MHP also wrote "refer to [ ] / Psych." (*Id*. at p. 4). A day later, on June 21, 2018, an intake screening uncovered that Cohn had a lithium prescription due to expire on June 29, 2018. (Doc. 56-1). On June 29, 2018, Cohn was issued a prescription of lithium for 30 days. (Doc. 56-2, p. 5).

After his prescription ran out—on or around July 31, 2018—Cohn talked to Nurse Woods about his lithium prescription. (Doc. 56-7, p. 13). Then a couple of days later, Cohn

again had a conversation with Nurse Woods about his lithium prescription running out. (*Id.*). At this second conversation, Nurse Woods informed Cohn to put in a request slip. (*Id.*). Cohn complied and gave her a request slip. (*Id.*). Cohn had a third conversation with Nurse Woods two weeks later, again complaining that he still was not receiving lithium. (*Id.*). At this third conversation, Nurse Woods told him to fill out a form to go to mental health, but Cohn never received the form. (*Id.*). Cohn had a fourth conversation with Nurse Woods about a week later. (*Id.*). At this fourth conversation, Nurse Woods told him to write a grievance complaining that he was not receiving his prescription for lithium. (*Id.* at p. 14).

For approximately 65 days—from July 29, 2018, to October 2, 2018—Cohn went without his prescribed medication. (Doc. 57, p. 3). During that time, he filled out eight request slips and had four conversations with Nurse Woods. (Doc. 56-7, pp. 13-17). Then Cohn filed a grievance on September 14, 2018, explaining that he is not receiving lithium. (Doc. 57-9, p. 2). In response to the grievance, a physician assistant noted that "[t]here is no reason in the chart why [ ] [Cohn] was not seen until [October 2, 2018]." (*Id.* at p. 3). On October 2, 2018, Cohn was seen by Dr. Felix Rodriguez for his Initial Psychiatric Evaluation. (Doc. 63, p. 3). Dr. Rodriguez immediately restarted Cohn's lithium prescription. (Doc. 57, p. 3).

During the relevant time, IDOC Administrative Directives 04.04.100 and 04.04.101 governed the provision of mental health services to inmates at Lawrence. (Doc. 57, pp. 3-4). Under the terms of AD 04.04.100, an inmate must be seen by a MHP within 48 hours of being admitted to a facility. (*Id.*). The MHP must "identify any mental health needs" for the inmate, complete a mental health screening, and if necessary, "flag the offender for further evaluation…" (*Id.*). Also, IDOC issued two policies that are outlined in IDOC Procedural Bulletins 18-001 and 2018-02. Under Bulletin 18-001, a bridge order for psychotropic

medication "cannot exceed a 30 day supply" and "may not be written again without" the inmate being "evaluated by a psychiatric provider." (*Id.*).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

**DISCUSSION**

I. **Count I – *Monell* Liability Against Wexford**

Cohn alleges that Wexford violated Cohn's constitutional rights through an official policy and/or an unofficial custom to restrict "certain individuals" from treatment. (Doc. 8, p. 2); *see Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690–91 (1978); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d. 954, 966-67 (7th Cir. 2019) (applying *Monell* to private corporations, like Wexford, which act under the color of state law). To move ahead on this part of the case, Cohn must show that his Eighth Amendment rights were violated by "(1) an express [corporate] policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (citations omitted).

Wexford does not contest whether Cohn was deprived of his constitutional rights. Instead, Wexford argues that "[Cohn] cannot satisfy any of these three tests." (Doc. 56, p. 6). The Court disagrees. After construing the evidence in a light most favorable to Cohn, it appears there are genuine disputes regarding whether: (1) Wexford made a conscious policy choice not to implement a policy—like having an oversight committee—resulting in Cohn's disruption of desperately needed medication; and (2) Wexford has a widespread practice or custom of disrupting inmates' prescribed medications.

A. *Express Policy*

There is a disputed fact as to whether Wexford made a conscious policy choice *not* to implement a policy which resulted in Cohn's disruption of desperately needed medication. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) ("[i]naction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action'")

(quoting *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017); *Thomas v. Martija*, 991 F.3d 763, 774 (7th Cir. 2021) (acknowledging that "[i]t is true, as we held in *Glisson*, that the decision not to have a policy can itself be a policy for *Monell* purposes").

Cohn uses *Glisson* to argue that "a trier of fact could find that the Defendant here made a conscious decision to not adopt a treatment plan as required by the DOC to address [Cohn's] need for vital medication and similarly situated inmates whose psychiatric evaluations are scheduled beyond the expiration of their medications." (Doc. 57, p. 13). In *Glisson*, an inmate suffered from multiple serious illnesses and disabilities which "were apparent at a glance." 849 F.3d at 375. Ultimately, he came under the care of Corizon, a private health care provider contracting with Indiana Department of Corrections ("INDOC") to provide medical care. *Id*. At the Reception Diagnostic Center, the inmate was seen by numerous medical providers who recorded his medication regimen, tracheostomy, feeding tube, and mental state. *Id*. INODC then decided to place the inmate at Plainfield Correctional Facility. *Id*. At Plainfield, the inmate was again seen by numerous medical providers and his care became disjointed. *Id*. at 376. While the inmate received care, his symptoms worsened until he died after less than two months of being under the care of Corizon. *Id*. at 377.

The plaintiff in *Glisson* "assert[ed] that Corizon had a deliberate policy not to require any kind of formal coordination of medical care either within an institution (such as the Diagnostic Center or Plainfield) or across institutions for prisoners who are transferred." *Id*. at 379. The Seventh Circuit noted that the "INDOC has Chronic Disease Intervention Guidelines, which explain what policies its health-care providers are required to implement." *Id*. at 380. "Healthcare Directive HCSD-2.06 states that each facility must adopt instructions

for proper management of chronic diseases, and it spells out what those instructions should address." *Id*. The Seventh Circuit continued noting the following:

> Among other things, it calls for "planned care in a continuous fashion" and care that is "organized and ... consistent across facility lines." It specifically mandates a treatment plan for chronic cases—both an initial plan and one that is updated as care needs change. In the face of this directive, which appeared seven years before [decedent] showed up in prison, Corizon consciously chose not to adopt the recommended policies—not for [decedent], not for anyone. As relevant to [plaintiff's] case, it admitted that his care at INDOC was based only on general standards of medical and nursing care, not on any "written policies, procedures, or protocols." It relied on none of the Health Care Service Directives in the course of his treatment.

*Id*. The Court acknowledged that nothing in the U.S. Constitution required Corizon to follow INDOC's policies. *Id*. The Court noted, however, that "[t]he point is a more subtle one: the existence of the INDOC Guidelines, with which Corizon was admittedly familiar, is evidence that could persuade a trier of fact that Corizon consciously chose the approach that it took." *Id*.

Similar to the INDOC in *Glisson*, the IDOC adopted Administrative Directives regarding the healthcare services of inmates "to establish uniform procedures to ensure adequate non-emergency mental health services are provided to offenders with need." (Doc. 56-3, p. 10). Also, similar to the policy adopted by the INDOC in *Glisson*, the IDOC's directives require "[a] mental health treatment plan, including the establishment of a treatment team, if applicable, shall be established for all offenders requiring on going mental health services." (*Id*. at p. 11). While nothing in the U.S. Constitution requires Wexford to follow IDOC policies—the point is Wexford is familiar with the existence of IDOC directives. (Doc. 56-4). Thus, like Corizon's familiarity with INDOC's Guidelines, Wexford's familiarity

with IDOC's directives is evidence that could persuade a jury that Wexford consciously chose the approach it took.

In its reply, Wexford argues "[Cohn] never alleged the absence of a policy was the proximate cause of his injury." (Doc. 63, p. 9). Wexford notes:

> [Cohn] has not submitted any evidence to the Court that he exhausted his claim that Wexford's "policymakers' decision not to enact protocols to prevent the Plaintiff's denial of medication resulted in the violation of his constitutional rights." ECF No. 57, p. 11. [Cohn's] Complaint only includes a grievance which discusses [Cohn's] belief that a "psychiatrist has chosen to discontinue [his] medicine . . . ." ECF No. 1, p. 7. Neither that grievance, nor any of the subsequent responses, discuss the absence of a Wexford policy. *See Id*. at pp. 8–9. As a result, should [ ] [Cohn's] 11th hour theory be accepted, it would require further discovery and briefing on whether the [Cohn] exhausted his remedies as to this new lack-of-policy claim.

(*Id*.).

The fact that Cohn never alleged the absence of a policy was the proximate cause of his injury gets Wexford nowhere. In *Glisson*, the plaintiff never alleged the absence of a policy was the proximate cause of the decedent's death. *See* Compl., *Glisson v. Indiana Dep't of Corr.*, No. 1:12-CV-01418-SEB, (S.D. Ind. October 2, 2012). Rather, it was not until the plaintiff responded to the defendant's motion for summary judgment that plaintiff alleged "[defendant] has instituted a policy and/or practice that prevents its medical personnel from communicating properly and ensuring appropriate continuity of care for inmates with serious medical problems." *See* Doc. 68, p. 31.[1] Cohn, on the other hand, alleged in his complaint that Wexford restricts "certain individuals" based on their policies, and Wexford

---

[1] Notably, in *Glisson*, the plaintiff was not alleging absence of a policy. Rather, plaintiff alleged that Corizon had a "deliberate policy not to require any kind of formal coordination of medical care either within an institution (such as the Diagnostic Center or Plainfield) or across institutions for prisoners who are transferred." 849 F.3d at 379.

chose to ignore and disregard Cohn's pleas for his prescribed medication and treatment. (Doc. 1, p. 5).

Moreover, Wexford's argument regarding Cohn's failure to exhaust this "new lack-of-policy claim" must be rejected.[2] "When a Wexford policy or practice is at issue, courts have held that grieving activities for which Wexford was responsible and/or involved in the decision-making process are generally sufficient to put the prison on notice that the plaintiff was grieving a Wexford policy or practice." *Diaz v. Baldwin*, 2021 WL 1401463, at *3 (S.D. Ill. Apr. 14, 2021) (citations omitted). Courts within the Seventh Circuit have "indicated that failing to identify Wexford and a specific type of policy or practice attributable to Wexford are not necessarily sufficient to grant summary judgment in favor of the Defendant." *Arce v. Wexford Health Servs.*, 2019 WL 6702692, at *5 (S.D. Ill. Oct. 9, 2019) (citations omitted). Here, Cohn's grievance not only identified Wexford, but also grieved about activities for which Wexford was responsible—prescribing medication. (Doc. 1, p. 7). Cohn's grievance even requested for there to be an oversight committee. In fact, the grievance could be construed as Cohn complaining about Wexford's lack of a policy or practice of not having "an oversight committee." (*Id.*). Requiring inmates to do more than Cohn did here would be preposterous. *See Johnson v. Shah*, 2017 WL 119175, at *2 (S.D. Ill. Jan. 12, 2017) (acknowledging that "[r]equiring inmates with no formal legal education to articulate the subtleties of a *Monell* claim or a third party beneficiary action on a grievance form is asking a lot"). Accordingly, there is a genuine dispute as to whether Wexford made a conscious policy choice not to

---

[2] On March 18, 2020, Wexford withdrew their affirmative defense that Cohn failed to exhaust his administrative remedies. (Doc. 28, p. 1).

implement a policy which resulted in Cohn's disruption of desperately needed medication, and summary judgment must be denied.

    B. *Widespread Practice or Custom*

One Seventh Circuit case, *Hildreth v. Butler*, 960 F.3d 420 (7th Cir. 2020), appears to foreclose Cohn's widespread practice or custom theory. In *Hildreth*, the plaintiff brought a *Monell* claim against Wexford claiming that "Wexford has a custom of delaying prescriptions." *Id*. at 426. The Seventh Circuit held that the plaintiff failed to provide enough evidence to show a practice of delaying prescriptions was widespread. *Id*. Specifically, the Court noted that "[plaintiff's] claim fails on two axes: first, his allegations of delays are insufficiently widespread, as they involve only him; and second, the alleged delays are insufficiently numerous, as he has substantiated only three." *Id*. The Court then stated:

> *Three instances of prescription delays* over nineteen months involving *solely one inmate* fail to qualify as a widespread unconstitutional practice so well-settled that it constitutes a custom or usage with the force of law. *Although this court has not adopted any "bright-line rules" defining a widespread practice or custom, we have acknowledged that the frequency of conduct necessary to impose Monell liability must be more than three. Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (noting "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' or even three") (citations omitted); *see also, e.g., Doe v. Vigo Cty.*, 905 F.3d 1038, 1045 (7th Cir. 2018) (holding a "handful of incidents of misconduct," including three incidents of sexual contact, two incidents of inappropriate comments, and two allegations of harassment over two decades "is not enough to establish a custom or practice"); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005) (holding three incidents of improper pepper-spraying over a three-year period did not amount to a widespread custom); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (holding three incidents of erroneously denying to vehicle owners that their vehicles were in the impoundment lot over a four-year period did not amount to a persistent and widespread practice).

*Id*. at 427 (emphasis added).

On the surface, it appears that like the plaintiff in *Hildreth*, who only provided evidence of three delays in his *personal* prescriptions, Cohn "is attempting to plead a *Monell* claim based *solely on his experience* with a disruption in his lithium prescription." (Doc. 56, p. 7) (emphasis added). But framing the evidence as merely one instance solely involving Cohn would be imprecise. Indeed, a deeper review of the evidence and the parties' arguments sets Cohn's case apart from *Hildreth*. Cohn is attempting to plead a *Monell* claim based on his <u>and</u> other inmates' experiences.

Wexford points to portions of Cohn's deposition transcript to argue that Cohn "conceded that he could not testify about whether these alleged incidents were similar to [Cohn's] claims." (Doc. 56, p. 4). Wexford does not point to case law as to how similar Cohn's claims must be to the alleged incidents involving other inmates. In *Howell*, 987 F.3d 647, however, the Seventh Circuit evaluated whether the trial court abused its discretion by excluding four witnesses because the four situations were not similar enough to the plaintiff's situation. *Id*. at 657-58. The Court explained:

> These first three witnesses offered essentially no relevant support for [plaintiff's] attack on Wexford's collegial review process. The fourth witness presented a closer question. He testified that he suffered a knee injury and sought surgery, which was rejected through the collegial review process. But the declaration is sparse on details and does not include evidence of a request for collegial review. It is not even clear whether any physician ever recommended surgery for this fourth witness. A proponent seeking to demonstrate an unconstitutional harm caused by the collegial review process must present evidence that the requested treatment was medically appropriate and that denial was not justifiable. The comparator evidence is not sufficient if it relies solely on the incarcerated person's own assessment of the appropriateness of the treatment. Saying "I was unhappy with my treatment" is not enough.

*Id*. at 658.

Wexford likely avoided discussing *Howell* because it hurts its argument. Unlike the plaintiff's attack on Wexford's collegial review process in *Howell*, Cohn's claim does not involve the collegial review process, and he does not have to do the extra step of presenting evidence that the requested treatment was medically appropriate and that denial was unjustifiable. In fact, imposing an additional burden on Cohn to present evidence that these other inmates requested medically necessary prescriptions would be improper at summary judgment—especially when Wexford failed to present evidence to the contrary. *See Spurling*, 739 F.3d at 1060 (acknowledging that summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law") (quoting Fed. R. Civ. P. 56(a)). Additionally, unlike in *Howell*—where the first three witnesses offered no support for the plaintiff's attack on Wexford's collegial review process—Cohn's witnesses offered support for his attack on Wexford's practice of disrupting inmates' prescriptions.[3]

Finding that Cohn has not presented evidence that Williams, Johnson, and Henny are similar enough to his situation would be imprecise. While Cohn fails to provide evidence of (1) the specific medications which they were denied;[4] (2) whether these inmates were seeking mental health treatment; and (3) whether these inmates had valid prescriptions—the Seventh Circuit is clear. "In applying *Monell* to prison healthcare, the issue is whether the similarities show a widespread practice that supports a finding of an unconstitutional custom or practice

---

[3] Tremain Williams complains about Wexford's practice of disrupting his prescribed medication because Wexford continuously gave his medication weeks late. (Doc. 57-11, p. 2). Darnell Johnson and Danny Henny also complain about Wexford's practice of disrupting their prescribed medication because Wexford denied them medication. (Doc. 57-1, p. 22).

[4] Notably, Cohn testified that Danny Henny's medication was for depression. (Doc. 57-1, p. 22). Cohn continued: "Zoloft, I think." (*Id*.).

[and] . . . [ ] the comparator need not be perfect in either context." *Id*. at 657 (citations omitted). Moreover, the procedural posture in *Howell* is significant as the Seventh Circuit was evaluating whether the trial court abused its discretion by excluding affidavits after Wexford's motion in *limine*. At summary judgment, the Court must construe the evidence in a light most favorable to Cohn—and Wexford has not come forward with evidence to put the similarity of these inmates' situations beyond dispute.

Next, Wexford argues that Cohn's deposition testimony regarding the alleged existence of other incidents is hearsay. (Doc. 56, p. 7). The problem is Wexford failed to argue that Cohn's testimony cannot be presented in a form that would be admissible in evidence. *Woods v. Rose*, 2020 WL 6940827, at *4 (S.D. Ill. Nov. 25, 2020); *see also Lewandowski v. City of Milwaukee*, 823 F. App'x 426, 428–29 (7th Cir. 2020) (noting that a district court "cannot consider inadmissible hearsay, *over proper objections*, in deciding summary judgment") (emphasis added).[5]

Most importantly, ignoring the alleged incidents involving other inmates does not help Wexford because Cohn still provides evidence that Wexford disrupted his lithium prescription on *more than three occasions*. Cohn testified that from July 29, 2018, through October 2, 2018—he filled out eight request slips and had four conversations with Nurse Woods. (Doc. 56-7, pp. 13-17). Wexford disputes this fact because "[Cohn] did not produce any records that indicated he made any such request[,]" (Doc. 63, p. 5), but Wexford failed to provide any evidence to put this issue beyond dispute. Accordingly, there is a genuine

---

[5] Even if Cohn's deposition testimony regarding the alleged existence of other incidents is hearsay, Cohn still provided an unsworn declaration from Tremain Williams complaining about Wexford's practice of disrupting his prescription. (Doc. 57-11, p. 2).

dispute as to whether Wexford has a widespread practice or custom of disrupting inmates' prescribed medication, and summary judgment must be denied.

## Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 56) is **DENIED**. This case shall proceed to trial on the issue of Defendant Wexford's deliberate indifference to Plaintiff Steven Cohn. A status conference will be set by separate order to establish final pretrial conference and trial dates.

**IT IS SO ORDERED.**

DATED: July 18, 2022

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**